# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kevin Henningsen, | Court File No. 14-CV-4482 (ADM/JJK) |
| Plaintiff, | |
| v. | |
| City of Blue Earth, | |
| Defendant. | |

**Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment**

## Table of Contents

**Introduction** ................................................................................................. 2

**Background** .................................................................................................. 3

I.      Mr. Henningsen has a disability .......................................................... 3

II.     Mr. Henningsen was an excellent employee ........................................ 5

III.    BELW's response to Mr. Henningsen's disability ............................... 7

IV.     Tim Stoner is hired as BELW's General Manager ............................... 9

V.      Mr. Henningsen suffers another major seizure in April 2013 and his doctor recommends that he be removed from on-call duty ............................... 9

VI.     Mr. Henningsen meets with Mr. Stoner on June 4 to discuss his on-call restriction, after which Mr. Stoner decides to terminate Mr. Henningsen's employment ....... 10

VII.    Mr. Henningsen is terminated based on false allegations of misconduct .............. 11

**Argument** ................................................................................................... 12

The City's motion should be denied because a reasonable jury could find that the City discriminated against Mr. Henningsen, failed to accommodate his disability, and retaliated against him for seeking an accommodation. ................................................... 12

I.      A reasonable jury could find for Mr. Henningsen on his discrimination claim ..... 13

        A.  The City's speculative assertions that Mr. Henningsen posed a "direct threat" lack merit ...................................................................... 14

        B.  The circumstances of Mr. Henningsen's termination give rise to an inference of discrimination ................................................................ 16

II.     A reasonable jury could find for Mr. Henningsen on his failure-to-accommodate claim .......................................................................................... 20

III.    A reasonable jury could find for Mr. Henningsen on his retaliation claim ........... 22

**Conclusion** ................................................................................................. 24

**Introduction**

Kevin Henningsen worked for the City of Blue Earth ("the City") for 22 years as an employee of the City's Light & Water department ("BELW"). He started in 1991 as an electric lineman, and eventually worked his way up to Line Superintendent. Mr. Henningsen was diagnosed with epilepsy in 2009 after suffering a seizure in May of that year.

On June 4, 2013, Mr. Henningsen met with his supervisor, Timothy Stoner, to inform Mr. Stoner that he needed to be removed from on-call duty because his doctor had concluded that the stress caused by being on call could trigger Mr. Henningsen's epileptic seizures. Later **that same day**, and for the first time, Mr. Stoner took steps to initiate the termination of Mr. Henningsen's employment. Approximately one week later, when Mr. Henningsen returned with paperwork from his doctor, Mr. Stoner refused to accept the document and sarcastically questioned "How can you even work here?"

This interaction alone—which goes nearly unmentioned in the City's brief—provides a reasonable jury with a sufficient basis to conclude that Mr. Henningsen was terminated because of his disability, and in retaliation for seeking an accommodation for that disability. Because material facts are genuinely in dispute in this case, summary judgment must be denied.

## Background

### I.     Mr. Henningsen has a disability.

Mr. Henningsen has epilepsy. ECF No. 22, Affidavit of Jana O'Leary Sullivan ("Sullivan Aff."), Ex. 26b. He experienced his first major seizure in May of 2009. Henningsen Dep. 82:1-3.[1] Following his seizure, Mr. Henningsen received a neurological evaluation at the Mayo Clinic. Henningsen Dep. 86:2-5. His neurologist indicated that Mr. Henningsen "should not be driving for six months" and "cautioned against [Mr. Henningsen] performing any work on the electrical lines." *See* Sullivan Aff., Ex. 26b; Henningsen Dep. 122:2-10.

After returning to work, Mr. Henningsen faced harassment from several co-workers, with one co-worker, Steven Sem, referring to Mr. Henningsen doing the "crappie flop."[2] Henningsen Dep. 132:23-133:1-3; Declaration of Kevin Henningsen ("Henningsen Decl.") ¶ 7. Mr. Henningsen reported the harassment to his supervisor at the time, Curt LaMaack. Henningsen Decl. ¶ 7. Mr. Henningsen also submitted the Mayo Clinic neurological evaluation that included the recommendations that he not be required to work on electrical lines or climb poles. Henningsen Dep. 63:6-16; 64:24-65:5. Although the City claims that Mr. Henningsen never informed BELW of his medical condition and work restrictions, Roger Davis witnessed Mr. Henningsen's discussion with Mr. LaMaack on June 1, 2009, and signed a written statement affirming that Mr.

---

[1] All deposition transcripts are attached to the Affidavit of Jana O'Leary Sullivan (ECF No. 22) as Exhibits 1-7.

[2] Comparing Mr. Henningsen's condition during a seizure to a fish out of water flopping on the ground.

Henningsen did submit his medical paperwork and requested accommodation. Declaration of Brock Specht ("Specht Decl."), Ex. A; *see also* Davis Dep. 111:5-113:24.

## II.   Mr. Henningsen was an excellent employee.

Mr. Henningsen began working for BELW as an electric line worker in 1991. Henningsen Decl. ¶ 3. In May 2000, Mr. Henningsen was promoted to Line Superintendent, supervising the crew of electric line workers responsible for maintaining the electric distribution and delivery system to the Blue Earth community. LaMaack Dep. 27:23 – 28:5. The general duties of a Line Superintendent include supervising the daily activities of the crew, resolving customer issues and concerns, and planning construction, maintenance, and repair projects. Sullivan Aff., Ex. 9 & Ex. 30; LaMaack Dep. 29:19-23. The job description for a Line Superintendent **does not include** working on electrical lines, climbing poles, or on-call duty outside of normal business hours. Sullivan Aff., Ex. 9 & Ex 30. However, Mr. Henningsen periodically performed these additional tasks. LaMaack Dep. 29:24-25.

Contrary to the City's portrayal of Mr. Henningsen, his employment records demonstrate that he was an excellent BELW employee. During Mr. Henningsen's 22-year tenure with BELW—from 1991 until 2013—he received five annual "Performance Appraisals"; in 2001, 2006, 2008, 2010, and 2011. With the exception of his 2010 Performance Appraisal,[3] Mr. Henningsen consistently met or exceeded the standards of his job requirements in each and every category of evaluation. For example:

---

[3] The 2010 Performance Appraisal—the only one containing negative comments—was the first appraisal Mr. Henningsen received after disclosing his disability to BELW.

- The 2001 Performance Appraisal notes that Mr. Henningsen met or exceeded all standards and provides the overall comment: "Kevin[] has done a great job this year." Specht Decl., Ex. B at 5.

- The 2006 Performance Appraisal notes that Mr. Henningsen met or exceeded all standards; notes that there were "no issues" related to his interactions with managers, co-workers, and others; and provides the overall comment: "Excellent work, Kevin. We're glad to have you in the Electric Sup[erintendent] role." Specht Decl., Ex. C at 4, 5.

- The 2008 Performance Appraisal notes that Mr. Henningsen met or exceeded all standards, indicates that there were "few if any customer complaints received," and provides the overall comment: "[E]xcellent job, excellent work. [A]nother good year." Specht Decl., Ex. D at 5.

- The 2011 Performance Appraisal indicates that Mr. Henningsen's overall performance exceeded standards and the comment states: "Kevin's overall performance has been great." Sullivan Aff., Ex. 49.

The only Performance Appraisal in Mr. Henningsen's file that contains negative comments regarding his performance is from 2010. This appraisal, like the others in Mr. Henningsen's file, generally notes that Mr. Henningsen met or exceeded most of the standards for his job requirements. Sullivan Aff., Ex. 48. It also contains a number of favorable comments such as "great job" and "Kevin is a very dependable employee." *Id.* However, the appraisal cites two reprimands Mr. Henningsen received following an "investigation" BELW conducted against Mr. Henningsen. As explained below, this "investigation" was commenced by BELW shortly **after** Mr. Henningsen disclosed his disability and the hostile work environment he faced from coworkers based on that disability.

Further, Mr. Henningsen's supervisors reported no problems or issues with his performance from 2000-2010.  LaMaack Dep. 31:15-21.  During his tenure, there were

6

no complaints from the public regarding his performance. LaMaack Dep. 31:16-17. His supervisor reported that he "was very good and excellent a lot of times at the physical work." LaMaack Dep. 44:1-2. He was also deemed dependable. LaMaack Dep. 63:5-7.

On balance, the Performance Appraisals and the comments from his supervisors make clear that Mr. Henningsen was an exemplary employee during his 22-year tenure with BELW. LaMaack Dep. 28:11-14. They also directly refute BELW's after-the-fact assertion that his supervisors "viewed him as a difficult employee with poor interpersonal, communication, and management skills." Def's Memo. at 4.

## III.   BELW's response to Mr. Henningsen's disability.

BELW took no action to accommodate Mr. Henningsen's disability or to address the harassment he faced from coworkers. Henningsen Decl. ¶¶ 5-7. Instead, BELW instituted two investigations **against** Mr. Henningsen based on claims from some BELW employees that he had created a hostile work environment. Sullivan Aff., Ex. 10 at 14. The primary complainant—Steven Sem—was the same employee who harassed Mr. Henningsen regarding his disability and made the "crappie flop" comment described above. Sullivan Aff., Ex. 10 at 12 & Ex 22 at 1; Henningsen Decl. ¶ 8.

Although both Mr. Henningsen and Roger Davis unequivocally denied that Mr. Henningsen engaged in any of the allegedly hostile activities, the investigator arbitrarily disregarded their statements and adopted the statements of the complainants. *See* Sullivan Aff., Ex. 10 at 85 ("both Mr. Henningsen and Mr. Davis denied any type or form of wrong-doing in response to each and every allegation"); *see also* Henningsen Dep. 261:9-269:25. Off the record, the investigator described his investigation of Mr. Henningsen as

a "witch hunt" and a "he said / he said" situation. Henningsen Dep. 171:5-8; Henningsen Decl. ¶ 9. In essence, the investigator admitted that BELW specifically targeted Mr. Henningsen in the investigation, and that there was no objective evidence supporting the conclusion that Mr. Henningsen engaged in any misconduct. *Id.*

Around November 2010, BELW again refused to accommodate Mr. Henningsen's disability. At that time, stress from work was affecting his health. He asked Mr. LaMaack to transfer him to an open position within the water department, which would have allowed him to better manage his epilepsy. Henningsen Dep. 282:16-21 & 285:1-4. Mr. LaMaack denied this request. Henningsen Dep. 284:22-24. The City contends that Mr. Henningsen was not qualified for this position, but it ignores the fact that Mr. Henningsen had previously held the required water license from the state of Iowa, while the person who was hired for the position had never been licensed. Henningsen Dep. 243:14-25 & 284:4-13.

During BELW's 2010 investigations, Mr. Henningsen again disclosed his disability. Sullivan Aff., Ex. 28. His supervisor, Mr. LaMaack, requested that Mr. Henningsen submit additional information from his doctor. *Id.*; Henningsen Dep. 95:10-11, 140:7-11. Mr. Henningsen's Neurologist reviewed the job description for Mr. Henningsen's position, and concluded that Mr. Henningsen's medical condition did not prevent him from performing "all essential functions of his position as outlined in the job description." Sullivan Aff., Ex. 31. As noted above, this description **did not include** working on electrical lines, climbing poles, or on-call duty outside of normal business hours in the list of essential job functions for Mr. Henningsen's position. Sullivan Aff.,

Ex. 9 & Ex. 30. Based on the duties that were actually listed, and the fact that at the time Mr. Henningsen's condition was "currently controlled," the neurologist concluded that "[n]o special accommodations [were] required" at that time. Sullivan Aff., Ex. 31.

**IV.     Tim Stoner is hired as BELW's General Manager.**

On March 1, 2013, Tim Stoner became the General Manager of BELW. Stoner Dep. 7:11-13. Mr. Stoner claims that during the process of interviewing for the General Manager position, he received authority from the board of BELW to terminate Mr. Henningsen. Stoner Dep. 93:20-23. Mr. Stoner also claims that during his first week as General Manager, Mr. Henningsen approached him in a threatening manner and declared the two would "wrestle." Stoner Dep. 22:17-21 At this time, Mr. Stoner claims he was aware of Mr. Henningsen's alleged past misbehavior and felt that his threatening conduct was consistent with that behavior. *Id.*

At some point between March 1 and June 4, 2013, Mr. Henningsen told Mr. Stoner about his epilepsy diagnosis. Stoner Dep. 33:17-35:7.

**V.      Mr. Henningsen suffers another major seizure in April 2013 and his doctor recommends that he be removed from on-call duty.**

Mr. Henningsen suffered his second major seizure in April 2013. Sullivan Aff., Ex. 35. Mr. Henningsen's Mayo Clinic neurologist subsequently evaluated his condition and concluded that it was "medically necessary that [Mr. Henningsen] not be on call" in order to mitigate the level of stress and anxiety and maintain his seizure control. Sullivan Aff., Ex. 37.

9

**VI.    Mr. Henningsen meets with Mr. Stoner on June 4 to discuss his on-call restriction, after which Mr. Stoner decides to terminate Mr. Henningsen's employment.**

Mr. Henningsen met with Mr. Stoner on June 4, 2013 to discuss the situation. Henningsen Dep. 157:15-158:3. Prior to that meeting, Mr. Henningsen had a conversation with his doctors about being removed from on-call duty. Henningsen Dep. 154:23-155:3. During the meeting on June 4, Mr. Henningsen talked to Mr. Stoner about the possibility of being taken off the on-call schedule. Henningsen Dep. 157:15-18. He also referred to his health condition during the conversation. Henningsen Dep. 294:18-295:5. Mr. Henningsen tried to directly address the issue of being removed from the on-call schedule, but Mr. Stoner "just worked his way around the question, and didn't want to hear it." *Id.*

Mr. Stoner disputes that Mr. Henningsen referenced his epilepsy or health condition during the meeting on June 4. Stoner Dep. 20:18-22, 32:9-11. He also testified that he did not recall Mr. Henningsen mentioning on-call duty during the meeting on June 4. Stoner Dep. 32:12-20, 46:10-19. However, he agrees that he decided to terminate Mr. Henningsen's employment that same day. Stoner Dep. 14:9-11. He also testified that **after** speaking with Mr. Henningsen on June 4, 2013, he contacted the League of Minnesota Cities to speak with someone who works in employment law as the first step in terminating Mr. Henningsen. Stoner Dep. 86:18-89:9.

Eight days later, on June 12, 2013, Mr. Henningsen and Mr. Stoner had another conversation about Mr. Henningsen's epilepsy and his request to be removed from on-call duty. Henningsen Dep. 158:4-14. Mr. Henningsen attempted to provide Mr. Stoner

with a copy of the letter from his doctor, but Mr. Stoner refused to accept it, and responded "How can you even work here?" *Id.*; Stoner Dep. 23:17-24:10.

**VII.   Mr. Henningsen is terminated based on false allegations of misconduct.**

Around one month later, on July 16, 2013, Mr. Stoner notified Mr. Henningsen that his employment with BELW was being terminated based on allegations of misconduct. Sullivan Aff., Ex. 43. Mr. Stoner's notice specifically identifies the following alleged misconduct:

- On March 7, 2013, Mr. Hennningsen indicated that a coworker contacted him asking to meet at Mr. Henningsen's house. Mr. Stoner asserts that Mr. Henningsen was the one to initiate the meeting, not the coworker.

- On April 26, 2013, Mr. Henningsen was "loud, angry and intimidating" when speaking with a customer.

- On June 4, 2013, Mr. Henningsen missed a safety training meeting at 8:00 because he had a conflicting meeting at 8:30 and then was working on setting a utility pole. Mr. Stoner asserts that this explanation was untruthful.

*Id.*

Mr. Stoner's allegations of misconduct are false. With regard to the March 7, 2013 incident, Mr. Henningsen was contacted by a coworker, Mike White, who wanted to meet with Mr. Henningsen privately at Mr. Henningsen's house. Henningsen Dep. 228:12-231:18; Henningsen Decl. ¶ 10. Mr. Stoner's allegation that Mr. Henningsen was the one who initiated this meeting and that Mr. Henningsen lied about doing so is untrue. Henningsen Decl. ¶ 10.

Mr. Stoner's allegation that Mr. Henningsen was loud, angry and intimidating while talking to a customer on April 26, 2013 is also untrue. Henningsen Decl. ¶ 13. Mr. Henningsen did not yell or act inappropriately that day. *Id.*

Finally, Mr. Henningsen was not dishonest about his whereabouts on the morning of June 4, 2013. Mr. Stoner claims that Mr. Henningsen lied about his reasons for missing a safety training meeting at 8:00 that morning. First, Mr. Henningsen did not know that the training was mandatory. Henningsen Decl. ¶ 12. Other employees were allowed to skip these trainings when they had conflicting duties. *Id.* In addition, Mr. Henningsen was honest about his activities that morning: he met with the janitor at the school shortly after 8:00 to discuss an upcoming project. Henningsen Decl. ¶ 11; Henningsen Dep. 243:9-17. After that, he went to the warehouse to prepare for a project later that morning involving setting a utility pole. Henningsen Dep. 243:18-23; Henningsen Decl. ¶ 11. This was urgent because the State was doing a project on Highway 169 and BELW needed to clear the area before the State's heavy equipment was brought in. Henningsen Dep. 242:8-19, 243:18-23.

## **Argument**

### **The City's motion should be denied because a reasonable jury could find that the City discriminated against Mr. Henningsen, failed to accommodate his disability, and retaliated against him for seeking an accommodation.**

The issue at summary judgment is not whether a plaintiff successfully convinces a court that he was discriminated against; rather, it is whether a dispute of material fact exists. *Johnson v. Minnesota Historical Soc.*, 931 F.2d 1239, 1244 (8th Cir. 1991); Fed. R. Civ. P. 56(c).

Under the summary judgment framework, the moving party bears the burden of producing sufficient evidence to establish that there are no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing whether the moving party has met its burden, "the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996) (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986)). Rather, the Court's function is "to determine whether a dispute about a material fact is genuine, that is, whether a reasonable jury could return a verdict for the nonmoving party based on the evidence." *Id.* The evidence of the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* "If reasonable minds could differ as to the import of the evidence, summary judgment is inappropriate." *Id.*

## I.   A reasonable jury could find for Mr. Henningsen on his discrimination claim.

The Americans with Disabilities Act (ADA) protects any "qualified individual" with a disability from discrimination based on that disability. 42 U.S.C. § 12112(a). The Minnesota Human Rights Act (MHRA) provides similar protections against discrimination based on disability. Minn. Stat. § 363A.08, subd. 2. The same legal analysis generally applies to disability-discrimination claims under the ADA and MHRA. *McCracken v. Carleton College*, 969 F. Supp. 2d. 1118, 1130 (D. Minn. 2013). The Plaintiff may prevail by establishing a *prima facie* case of discrimination, and by showing that any purported legitimate justification offered by the employer is a pretext for

discrimination. *Id.* The *prima facie* case is established by showing (1) that the employee has a disability within the meaning of the law; (2) that he is qualified to perform the essential functions of his job, with or without reasonable accommodation; and (3) that he suffered an adverse employment action because of his disability. *Id.*

The City's motion raises two challenges to Mr. Henningsen's discrimination claims related to his termination: (1) that he was not qualified because he posed a "direct threat" and (2) that there is no inference of discrimination in the circumstances surrounding his termination. *See* Def's Memo. at 25-30. Both arguments lack merit.

**A.      The City's speculative assertions that Mr. Henningsen posed a "direct threat" lack merit.**

"Direct threat" is an affirmative defense for which Defendants bear the burden of proof. *EEOC v. Hibbing Taconite Co.*, 720 F. Supp. 2d 1073, 1082 (D. Minn. 2010); 42 U.S.C. §§ 12111(3), 12113(b); Minn. Stat. § 363A.25. As such, the defense is waived if not specifically pled. *See* Fed. R. Civ. P. 8(c); *Andresen v. Fuddruckers, Inc.*, No. Civ. 03-3294 DWF/SRN, 2004 WL 2931346, at *8 (D. Minn. Dec. 14, 2004). The City did not plead "direct threat" as an affirmative defense in its Answer. ECF No. 5. The defense is therefore waived. *Andresen*, 2004 WL 2931346, at *8 ("Because Fuddruckers failed to plead its 'direct threat' affirmative defense, it has been waived.").

Even if the City had preserved this issue, its speculative assertion that Mr. Henningsen posed a direct threat lacks merit. A "direct threat" is a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. *EEOC v. Wal-Mart Stores, Inc.*,

477 F.3d 561, 571 (8th Cir. 2007); 42 U.S.C. § 12111(3); 29 C.F.R. § 1630.15; 29 C.F.R. § 1630.2(r); see also Minn. Stat. § 363A.25. The direct threat defense must be "based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job." 29 C.F.R. 1620.2(r). "The Supreme Court requires an individualized direct threat analysis that relies on the best current medical or other objective evidence." *Wal-Mart*, 477 F.3d at 571 (quotation omitted). Factors to consider are: "(1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm." 29 C.F.R. §1620.2(r); *Wal-Mart*, 477 F.3d at 571.

The City has not even attempted to meet the Supreme Court's mandate of an "individualized assessment" based on the "best current medical or other objective evidence." Nor does the City analyze the four-factor test described by the Eighth Circuit in the *Wal-Mart* case. Instead, the City simply assumes that because Mr. Henningsen suffered periodic "petit mal" seizures, he must have been a direct threat to himself or others. This speculative presumption is precisely the type of "discrimination based on prejudice, stereotypes, or unfounded fear" that the strict direct-threat standard is intended to guard against. *Wal-Mart*, 477 F.3d at 571 (citations omitted). It is also a far cry from the types of cases in which a direct threat was found to exist, such as *Johnson v. City of Blaine*, where the defendant based its argument not on speculation, but on a report "issued by an objective medical professional after a thorough and individualized assessment." 970 F. Supp. 2d 893, 909 (D. Minn. 2013). No such report is offered here.

As Mr. Henningsen's testimony makes clear, his petit mal seizures did not create a direct threat. The seizures are preceded by a physical warning, which Mr. Henningsen described as an "aura" that he experiences a few seconds before the seizure commences. Henningsen Dep. 92:1-14. He remains mentally aware of his surroundings and is able to understand if someone is talking to him, but is unable to respond for a short period of time. Henningsen Dep. 92:18-93:2. There is no evidence that Mr. Henningsen or anyone else has suffered any harm, or been in a position of imminent harm, as a result of his petit mal seizures. *See E.E.O.C. v. Hibbing Taconite Co.*, 720 F. Supp. 2d 1073, 1083 (D. Minn. 2010) (no direct threat where employee held job "for nine years without incident"). Accordingly, the City has utterly failed to produce evidence that the *Wal-Mart* factors weigh in favor of a finding of direct threat. Moreover, Mr. Henningsen testified that he has not suffered a petit mal seizure since July 2013. Henningsen Dep. 93:23-94:10. This suggests that the seizures can be (and have been) eliminated or reduced by reasonable accommodation, further preventing a finding of direct threat. *Wal-Mart*, 477 F.3d at 571.

**B.      The circumstances of Mr. Henningsen's termination give rise to an inference of discrimination.**

The City's only other challenge to Mr. Henningsen's discrimination claim is the contention that the circumstances of Mr. Henningsen's termination do not give rise to an inference of discrimination. This contention fails when the evidence is viewed in the light most favorable to Mr. Henningsen, as it must be for the purposes of the City's motion.

As an initial matter, the City asserts that an inference of discrimination requires evidence of disparate treatment. But this is not the exclusive means to establish an

inference of discrimination, and "any credible evidence tending to establish that an employer acted adversely to an individual on account of his disability will suffice." *Allen v. Interior Const. Servs., Ltd.*, 214 F.3d 978, 982 (8th Cir. 2000) (quotation omitted).

First, the timing and sequence of events is critical here. "[C]lose temporal proximity between an employer's discovery of a protected characteristic and an adverse employment action may, on rare occasions, suffice to create an inference of discrimination." *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1020 (8th Cir. 2005). The City points to a long history of alleged misconduct, all of which is disputed by Mr. Henningsen. But regardless of the accuracy of that history, it is clear that Mr. Stoner did not take action to terminate Mr. Henningsen until immediately after learning on June 4, 2013, that Mr. Henningsen's health condition was going to require some restrictions, or accommodations, to his job functions—including potentially being removed from on-call duty. A reasonable jury could conclude that it was this knowledge that motivated Mr. Stoner to contact the League of Minnesota Cities later **that same day** in order to initiate Mr. Henningsen's termination. *See Hillins v. Marketing Architects, Inc.,* 808 F. Supp. 2d 1145, 1153 (D. Minn. 2011) (evidence that employer took adverse action "within a business day or two after" learning of protected characteristic supports finding of pretext).

This conclusion is supported by the longstanding correlation between Mr. Henningsen's disclosure of his epilepsy and the City's allegations of misconduct. As described above, from 1991 to 2009 Mr. Henningsen's employment record at BELW was exemplary. There is no record of him ever receiving any discipline, and his performance

reviews are highly complimentary. Then, in May and June of 2009, Mr. Henningsen suffers his first major seizure, begins to be harassed by his coworkers, and reports the harassment and his medical condition to BELW. Henningsen Decl. ¶¶ 4-7; Henningsen Dep. 86:2-5, 132:25-133:3, 63:6-16, & 64:24-65:5. Shortly after that, the first allegations of misconduct are levelled against Mr. Henningsen, and BELW initiates an investigation against him. Henningsen Decl. ¶ 8; Sullivan Aff., Ex. 10. Next, from 2011 to 2013, while Mr. Henningsen's condition is under control and no accommodations are required, the allegations of misconduct cease, and Mr. Henningsen again receives a positive evaluation in 2011. Sullivan Aff., Ex. 49. But in 2013, when Mr. Henningsen again raises the issue of his health conditions and possible accommodation, the allegations of misconduct resume. Henningsen Dep. 158:4-14; Sullivan Aff., Ex. 49. Even accepting the City's contention most of these events are outside the 300-day limitations period, and therefore cannot form the basis of an independent claim for relief, this history is still relevant "as background evidence in support of a timely claim" of discrimination. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Beyond the timing of the events on June 4, 2013, there is additional evidence that the City's explanation is "unworthy of credence" and that "a discriminatory reason more likely motivated" the City. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981). First, Mr. Stoner contends that he was aware Mr. Henningsen had "a long history and pattern of … misconduct" (Stoner Aff. ¶ 3), to the extent that before Mr. Stoner accepted the position of General Manager at BELW, he  required reassurance from the BELW board that he would have the authority to terminate Mr. Henningsen. Stoner Dep.

18

27:12-28:23. He also testified that Mr. Henningsen engaged in at least two incidents of misconduct (intimidation and dishonesty) during Mr. Stoner's *first week* on the job, *before* Mr. Stoner knew about Mr. Henningsen's epilepsy. Stoner Dep. 22:11-21, 40:11-41-14. Mr. Stoner's affidavit supplements these allegations with a laundry list of vague allegations of at least six *additional* incidents of misconduct that allegedly occurred before June 4, 2013. *See* Stoner Aff. ¶¶ 4-5. Yet none of these myriad infractions prompted Mr. Stoner to terminate Mr. Henningsen—the misconduct, if it actually occurred, was apparently tolerated all the way up to **the very day** that Mr. Henningsen raised the issue of his health condition and possible on-call accommodations on June 4, 2013. Evidence that an employer tolerated a series of acts of misconduct then suddenly took adverse action based on a similar act of misconduct shortly after the employee engaged in protected activity demonstrates pretext. *Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1079-80 (8th Cir. 2005).

Similarly, Mr. Stoner's comments and demeanor during his meetings with Mr. Henningsen on June 4 and June 12, 2013, suggest that Mr. Henningsen's disability actually motivated his decision to terminate Mr. Henningsen. For example, when Mr. Henningsen raised the issue of an accommodation on June 4, Mr. Stoner was evasive: he "just worked his way around the question, and didn't want to hear it." Henningsen Dep. 294:18-295:5. Even more explicitly, when Mr. Henningsen pressed the issue of his health condition on June 12, 2013, Mr. Stoner refused to accept Mr. Henningsen's medical documentation and responded "how can you even work here?" Henningsen Dep. 158:4-14; Stoner Dep. 23:17-24:10.

At bottom, there is more than sufficient evidence for a reasonable jury to infer discrimination based on the circumstances surrounding Mr. Henningsen's termination. The City's allegations of misconduct lack merit. But even if these allegations are credited, the evidence demonstrates that the alleged misconduct was tolerated repeatedly, right up to the very day that Mr. Stoner decided to terminate Mr. Henningsen. The City's motion for summary judgment on Mr. Henningsen's discrimination claim should be denied.

## III.   A reasonable jury could find for Mr. Henningsen on his failure-to-accommodate claim.

Employers have an affirmative duty to "make reasonable accommodations to the known disability of a qualified disabled person" unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of its business." *Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944, 951 (8th Cir. 1999); 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a); Minn. Stat. § 363A.08(6).

A plaintiff who asserts a failure to accommodate claim ordinarily must establish that: (1) he was disabled; (2) the employer knew of the disability; and (3) the employer failed to make a reasonable accommodation for that disability.  *Dixon v. Mount Olivet Careview Home*, No. 09-CV-1099 (MJD/AJB), 2010 WL 3733936, at *6 (D. Minn. Sept. 17, 2010); *Hoover v. Norwest Private Mortgage Banking*, 632 N.W.2d 534, 547 (Minn. 2001). Such claims are analyzed using "a modified burden-shifting analysis, because discriminatory intent is not at issue." *Eldredge v. City of St. Paul,* 809 F. Supp. 2d 1011,

1034 (D. Minn. 2011) (quoting *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1074 (8th Cir. 2006)).

The City contends that Mr. Henningsen's failure-to-accommodate claim fails because "it is undisputed that on-call duty is an essential function of [Mr. Henningsen's] position." Def's Memo. at 33.[4] BELW's own records, however, directly contradict this assertion. Mr. Henningsen's job description explicitly refers to "the Americans with Disabilities Act definition of essential job functions" and identifies seven "Essential Job Functions" for the position. Sullivan Aff., Ex. 9. On-call duty is not one of the items on the list. *Id.* At a minimum, there is a fact dispute as to whether on-call duty was an essential function of Mr. Henningsen's position.

Even if the specific accommodation initially requested by Mr. Henningsen would have imposed an undue burden, BELW's failure to engage in the interactive process to identify potential alternative accommodations prevents summary judgment. "To determine the appropriate reasonable accommodation it may be necessary for the employer to initiate an informal, interactive process with the employee with a disability in need of the accommodation." *Fjellestad*, 188 F.3d at 951 (quotation and citation omitted). Here, BELW completely failed to engage in the interactive process on several occasions, including when Mr. Henningsen raised the issue of his disability and potential

---

[4] The City also incorporates its previous "direct threat" arguments: that Mr. Henningsen was not qualified and could not safely perform his job. Def's Memo. at 33. For the reasons discussed above, these arguments lack merit.

accommodations on June 4, 2013.[5] "[T]he Eighth Circuit has held that the failure to enter into the interactive process is prima-facie evidence of bad faith, and that when such bad faith is present, summary judgment is not generally appropriate." *E.E.O.C. v. Hibbing Taconite Co.*, 720 F. Supp. 2d 1073, 1083 (D. Minn. 2010).

## IV.   A reasonable jury could find for Mr. Henningsen on his retaliation claim.

To show unlawful retaliation, a plaintiff must establish a prima facie case of (1) engagement in activity protected by the ADA, (2) adverse employment action, and (3) causal connection between protected act and adverse action. *Foster v. Time Warner Entertainment Co., L.P.*, 250 F.3d 1189, 1194 (8th Cir. 2001). Generally, "the threshold of proof necessary to establish a prima facie case is minimal." *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1022 (8th Cir. 1998).

The City concedes for purposes of this motion that Mr. Henningsen engaged in protected activity when he requested an accommodation on June 4, and that he suffered an adverse employment action when he was terminated. Thus, the first two elements are not in dispute and the only issue is whether a reasonable jury could infer a causal connection between Mr. Henningsen's protected activity on June 4, 2013 and Mr. Stoner's decision to terminate Mr. Henningsen that same day.

There is sufficient evidence for the jury to find a causal connection. The timing of the decision alone is highly suspicious. A "very close temporal proximity" between the protected conduct and the adverse action may establish causation. *Gordon v. Gerard*

---

[5] Other occasions where BELW failed to engage in the interactive process include Mr. Henningsen first disclosed his disability and work restrictions in June 2009 and when Mr. Henningsen requested a transfer to the water department in 2010.

*Treatment Programs, L.L.C.*, 390 F. Supp. 2d 826, 839 (N.D. Iowa 2005); *see also Stockton v. Nw. Airlines, Inc.*, 804 F. Supp. 2d 938, 952 (D. Minn. 2011) ("The Court concludes that Stockton has satisfied the causal connection requirement with the close temporal proximity between his request for accommodation and NWA's adverse employment action."). Mr. Stoner admitted at his deposition that he first contacted the League of Minnesota Cities to initiate Mr. Henningsen's termination on June 4 in response to the conversation that occurred earlier that day. Stoner Dep. 14:9-18 & 19:2-21. That conversation included a discussion of Mr. Henningsen's health condition and request to be removed from the on-call schedule. Henningsen Dep. 157:15-20. A reasonable jury could conclude that Mr. Stoner's decision to terminate Mr. Henningsen was based on the discussion of those issues.

Beyond the timing, Mr. Stoner's conduct in response to Mr. Henningsen's request further demonstrates that his decision to terminate Mr. Henningsen was based on the accommodation request. When Mr. Henningsen first raised the issue on June 4, Mr. Stoner was evasive and "didn't want to hear it." Henningsen Dep. 294:18-295:5. Then, when Mr. Henningsen returned eight days later with the letter from his doctor requesting removal from on-call duty, Mr. Stoner refused to accept the document and sarcastically questioned "how can you even work here?" Henningsen Dep. 158:4-14; Stoner Dep. 23:17-24:10. This statement, along with his refusal to accept the letter and his evasiveness at the prior meeting, clearly demonstrates that Mr. Stoner did not believe Mr. Henningsen could continue in his job in light of his disability. A reasonable jury could conclude that Mr. Stoner's animus toward Mr. Henningsen's disability and the requested

accommodation further supports the conclusion that Mr. Stoner's termination decision was based on Mr. Henningsen's protected activity.

Finally, there is strong evidence that the City's explanation of the reason for Mr. Henningsen's termination is "unworthy of credence." As described above, the City relies on a series of allegations of misconduct that were allegedly ongoing for months, if not years, before Mr. Stoner decided to terminate Mr. Henningsen. "Where an employer tolerates an undesirable condition for an extended period of time, and then, shortly after the employee takes part in protected conduct, takes an adverse action in purported reliance on the long-standing undesirable condition, a reasonable jury can infer the adverse action is based on the protected conduct." *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 875 (8th Cir. 2008). A jury could reasonably conclude that it was **not** the alleged misconduct, but Mr. Henningsen's request for an accommodation, that was the final straw and thus the true cause of Mr. Henningsen's termination. *See Burrage v. United States*, 134 S. Ct. 881, 888 (2014) (explaining that the "straw that broke the camel's back" is the "but for" cause of an event).

## Conclusion

This case involves simple, genuine factual disputes that prevent the entry of summary judgment. The City contends that Mr. Henningsen was terminated for misconduct, but the record shows that the substance of these allegations are disputed, and that the alleged misconduct—most of which supposedly occurred years before Mr. Henningsen's termination—was tolerated by the City up until the very day that Mr. Henningsen asked for an accommodation. The record also demonstrates that Mr.

Henningsen's supervisor refused to discuss any potential accommodation, and instead initiated his termination that very day. These facts, viewed in the light most favorable to Mr. Henningsen, would allow a reasonable jury to conclude that the City discriminated against Mr. Henningsen, failed to accommodate his disability, and retaliated against him for seeking an accommodation. Accordingly, the City's motion for summary judgment should be denied.

Dated: January 21, 2016

**NICHOLS KASTER, PLLP**

/s/ Brock J. Specht
Matthew H. Morgan (#304657)
morgan@nka.com
Brock J. Specht (#0388343)
bspecht@nka.com
80 South Eighth Street
4600 IDS Center
Minneapolis, MN 55402-2242
Telephone:  (612) 256-3200
Facsimile:  (612) 338-4878

*Attorneys for Plaintiff*