## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kevin Henningsen,

                Plaintiff,                **MEMORANDUM OPINION
AND ORDER**

v.                                    Civil No. 14-4482 ADM/HB

City of Blue Earth,

                Defendant.

_____

Brock J. Specht, Esq., Nichols Kaster, PLLP, Minneapolis, MN, on behalf of Plaintiff.

Jana M. O'Leary Sullivan, Esq., League of Minnesota Cities, St. Paul, MN, on behalf of
Defendant.

_____

## I.  INTRODUCTION

On February 10, 2016, the undersigned United States District Judge heard oral argument

on Defendant City of Blue Earth's ("Blue Earth" or the "City") Motion for Summary Judgment

[Docket No. 18].  Plaintiff Kevin Henningsen's ("Henningsen") Complaint [Docket No. 1]

alleges that his employment with Blue Earth was terminated in violation of the Americans with

Disabilities Act and the Minnesota Human Rights Act.  For the reasons set forth below, Blue

Earth's Motion is denied.

## II.  BACKGROUND

### A.  Henningsen's Employment

Blue Earth Light and Water ("BEL&W"), a municipal department, provides electric, gas,

water, and other utility services for Blue Earth, Minnesota.  O'Leary Sullivan Aff. [Docket No.

22] Ex. 53 § 7.03.  Henningsen began working at BEL&W as an electrical line worker in 1991.

Id. Ex. 1 ("Henningsen Dep.") 35:4–8.  As a line worker, Henningsen's duties included working

on specific projects, performing general maintenance, and reading electrical meters. Id. 44:3–5. In 2000, Curt LaMaack, BEL&W's operations manager, selected Henningsen to be line superintendent.  Id. 46:11–22.  As line superintendent, Henningsen's general responsibilities included supervising construction, operations, maintenance, and repair crews; researching and resolving customer issues and concerns; and planning and designing construction, maintenance, and repair projects.  O'Leary Sullivan Aff. Ex. 9.  In this capacity, Henningsen determined daily tasks and schedule, delegating duties to subordinate employees as he saw fit.  Henningsen Dep. 113:12–114:13.

### 1.  Early Performance Evaluations

Henningsen's employment file includes five performance appraisals.  The first, for the year 2001, rated Henningsen favorably across each topic of review and concluded that Henningsen has "done a great job this year."  Specht Decl. [Docket No. 27] Ex. B. Henningsen's 2006 appraisal was also uniformly positive, reporting that Henningsen has done "excellent work" and that BEL&W is "glad to have you in the Electric Supt role.  Great ability to work efficiently and independently."  Id. Ex. C.  Henningsen's 2008 review was similar and concluded with "excellent job, excellent work.  Another good year."  Id. Ex. D.

### 2.  Employee Complaint and Investigation

In the summer of 2009, Steven Sem, a fellow BEL&W employee, complained that Henningsen had been harassing him and had slapped him in the face.  O'Leary Sullivan Aff. Ex. 12 at 12.  Sem reported the incident to Tim Stoner, who was the safety director for the Minnesota Municipal Utilities Association at the time.  Id. p. 23; Ex. 2 ("Stoner Dep.") 105:8–18.  Stoner relayed Sem's complaint to LaMaack.  Id. Ex. 4 ("LaMaack Dep.") 8:14–20; 107:11–15.

In October 2009, BEL&W responded to Sem's complaints by hiring Setter & Associates, an employment investigations firm, to examine Sem's complaint.  Id. Ex. 3 ("Leland Dep.") 52:4–7; Ex. 10 ("2009 Investigation Report") at 11.  In addition to the slapping incident, the investigator probed over ten other complaints of Henningsen's conduct, including allegations of angry outbursts, harassing and intimidating phone calls, and other physical touching.  See generally 2009 Investigation Report.  The investigation included seven interviews of BEL&W employees, including Sem, Henningsen, and LaMaack.  Id. at 11.

A. J. Childs, a former BEL&W lineman, was interviewed.  In addition to reporting that Henningsen had angry outbursts that seemed to come out of nowhere, Childs reported that in 2007, Henningsen grabbed and bear-hugged him against the side of a work truck.  Id. at 58–62.  Childs further related an incident in 2008 when Henningsen had become upset and threw a screwdriver over his and a another employee's heads.  Id. at 63–65.  Childs also claimed that in 2008 Henningsen threw a piece of a light pole at him while Henningsen was elevated in a bucket lift.  Id. at 70-73.

The investigator determined that it was more than likely that most of Sem's and Childs' allegations against Henningsen were true.  Id.  Paul Leland, BEL&W's general manager at the time, considered LaMaack's recommendation to terminate Henningsen's employment.  Leland Dep. 8:17–24; 30:22–31:2.  However, since BEL&W did not have a respectful workplace policy and because the allegations against Henningsen were not well documented, Leland concluded that BEL&W lacked the necessary foundation to terminate Henningsen.  Id. 32:9–15.

Instead, on March 11, 2010, BEL&W issued a written reprimand to Henningsen.  Id. Ex. 20.  The reprimand states that Henningsen's conduct and behavior created a hostile work

environment and that Henningsen was required to complete an anger management class.  Id.  The reprimand cautions that should Henningsen engage in future inappropriate or offensive behavior, he would be subject to additional disciplinary action up to and including termination.  Id.

After the investigation, BEL&W augmented its employee handbook by adding a Respectful Workplace Policy.  LaMaack Dep. 39:12–15; O'Leary Sullivan Aff. Ex. 11. Employees were also given training on the handbook's policies.  Henningsen Dep. 73:19–21.

### 3.  Follow-up Investigation

BEL&W requested that Setter & Associates return within a year to assess working conditions and evaluate the success of the changes BEL&W implemented after the 2009 report. Id. Ex. 22.  The follow-up assessment, which took place on October 13, 2010, determined that the reprimand following the 2009 investigation temporarily improved working conditions, but continuing efforts were needed to resolve personality conflicts.  Id.  The investigation also noted that Henningsen, purportedly in an effort to protect himself from further allegations of misconduct, obtained notarized statements from BEL&W employees he supervised regarding whether the working environment is or has ever been hostile and whether they believe Henningsen is a good supervisor.  Id.  Henningsen was told by the investigator that this activity was unprofessional and should stop.  Id.

The follow-up assessment resulted in Henningsen's second written reprimand.  Id. Ex. 23.  This reprimand, dated November 17, 2010, states that:

> The follow-up investigation substantiated that continuing interdepartmental conflicts are a result of 1) ineffective leadership on your part concerning supervisory/subordinate relationships, and/or 2) a lack of effort/ability to respect and work with utility employees from other departments.  Several employees expressed to the investigators that interpersonal conflicts continue to be fostered by you regarding Power Plant employees and others.

4

Id.  The reprimand further states that Henningsen's efforts to protect himself by obtaining

statements from coworkers was "unprofessional and intolerable."  Id.  The second reprimand

concluded similarly to the first.  Henningsen was reminded to observe professional standards in

the workplace and failure to do so would result in additional discipline up to and including

termination.  Id.

### 4. Later Employment Evaluations

The substance of the reprimands were reflected in Henningsen's 2010 performance

appraisal.  Id. Ex. 48.  While BEL&W recognized that Henningsen was a skilled worker, his

performance appraisal concludes that "personell [sic] conflicts out weigh [sic] his other good

work."  Id.  Henningsen's 2011 performance appraisal, in contrast, was positive across the board.

Id. Ex. 49.  BEL&W rated Henningsen's overall performance as exceeding expectations and

noted that his "overall performance has been great."  Id.

## B.  Henningsen's Disability

The morning of May 2, 2009, Henningsen had a seizure.  Id. Ex. 25b.  The convulsions

lasted approximately three to four minutes and Henningsen remained confused and disoriented

for roughly ten minutes after the convulsions stopped.  Id.  At a May 22, 2009 neurology

evaluation, Henningsen described having had "episodes occurring about two to three times per

month over the last 8 years" where his thinking and speaking were briefly impaired for five to

ten seconds.  Id.  The neurologist reported that the May 2 event was consistent with a

"generalized seizure" and the other episodes were "consistent with simple partial seizures."  Id.

In a follow-up appointment one week later, Henningsen was diagnosed with epilepsy and his

neurologist instructed him to abstain from driving for six months and cautioned against

performing any work on electrical lines.  Id. Ex. 26a.

On June 1, 2009, Henningsen avers he gave LaMaack his neurologist's evaluation. Henningsen Decl. ¶ 5.  LaMaack responded by telling Henningsen to "use your best judgment." Id. ¶ 6.  Henningsen did not explicitly request to be removed from driving duties or from working on power lines.  Henningsen Dep. 64:17–23.  Shortly thereafter, LaMaack contacted Leland and told him of Henningsen's seizure.  Leland Dep. 38:22–39:8.  Epilepsy was not mentioned.  Id. 39:17–19.  Leland told LaMaack that Henningsen should be permitted time off from work to address his medical concerns.  Id. 37:22–39:4.

On November 2, 2009, Leland spoke with Henningsen and his wife.  Id. Ex. 51.  While the impetus for this conversation is not in the record, according to Leland's notes, Henningsen claimed that LaMaack's response to "use your best judgment" is to "get rid of the guy with epilepsy."  Id.  Leland avers this is the first time he learned that Henningsen had been diagnosed with epilepsy.  Id.

During Setter & Associates' 2010 follow-up investigation, the investigator informed BEL&W that Henningsen reported that he had previously disclosed his epilepsy to BEL&W and requested workplace accommodations.  Leland Dep. 49:25–50:14.  On October 3, 2010, LaMaack wrote to Henningsen to dispute Henningsen's assertion that he had previously disclosed his epilepsy in 2009.  Id. Ex. 28.  In addition, LaMaack requested that Henningsen provide BEL&W with documentation of his condition, and for Henningsen's medical provider to review the line superintendent's job description to determine what duties Henningsen was unable to perform and whether Henningsen needed any accommodations because of his condition.  Id.

In a February 10, 2011 letter, Henningsen's neurologist, Dr. Jeffrey Britton, wrote that Henningsen does not have a physical or mental impairment. Id. Ex. 31. Dr. Britton additionally wrote that Henningsen is able to perform all of the essential functions of his position as outlined in the line superintendent's job description. Id. Finally, Dr. Britton stated that Henningsen's condition does not pose a risk of safety or health at the job site and that no special accommodations are required. Id.

## C. Stoner is Hired as BEL&W's General Manager

On March 1, 2013, BEL&W hired Stoner, the former safety director for the Minnesota Municipal Utilities Association. Stoner Dep. 7:11–13. Stoner was the person to whom Steven Sem reported Henningsen's behavior in 2009. Prior to accepting the position, Stoner was assured by the BEL&W board that his efforts to redress Henningsen's behavior and attitude would be supported. Id. 27:15–28:23. Stoner took no immediate action concerning Henningsen. Id. 41:10–42:1; 93:25–94:5. Within the first week of Stoner's tenure as general manager, a meeting was convened to talk about new starts, open and honest communication, and treating everyone with respect. Id. 22:12–16. Stoner avers that after this meeting, Henningsen said "you and I are going to wrestle." Id. 22:17–20. Stoner did not document this encounter. Id. 22:22–25.

Stoner learned about Henningsen's epilepsy sometime after March 1, 2013. Id. 34:3–35:3. Stoner was initially concerned about Henningsen's ability to safely perform his job. Stoner Aff. [Docket No. 21] ¶ 9. After reviewing Dr. Britton's February 20, 2011 note and consulting with LaMaack, Stoner's concerns regarding Henningsen's performance were temporarily assuaged and Stoner did not take any action to alter Henningsen's work

responsibilities.  Id.

**D.  Other Incidents**

On March 7, 2013, Stoner alleged that Henningsen was being dishonest about meeting a coworker.  O'Leary Sullivan Aff. Ex. 43.  According to Stoner, Henningsen stated that a coworker called and asked to meet at his house.  Id.  Stoner reviewed the matter and determined that Henningsen was the one who had initiated the meeting.  Id.  Later, on April 26, 2013, Stoner heard that Henningsen was loud, angry, and intimidating to a BEL&W customer.  Id. Henningsen denied both of these events occurred.  Id.  Stoner did not take any formal disciplinary action as a result of these incidents.

**E.  Henningsen has a Second Seizure**

On April 19, 2013, Henningsen suffered a second seizure that required medical attention. O'Leary Sullivan Aff. Ex. 36.  As a result, Henningsen's neurologist recommended that Henningsen be taken off on-call duty to reduce his stress and anxiety.  Id. Ex. 37.

**F.  June 4, 2013**

The morning of June 4, 2013, a safety meeting was scheduled for BEL&W employees. Id. Ex. 52c.  Henningsen, who was scheduled to attend the meeting, was absent.[1]  Id.  After the safety meeting, Stoner spoke with Henningsen about his absence.  Id.  Henningsen claimed that he missed the safety meeting because he had a different meeting scheduled at the Junior High at the same time.  Id.  Stoner challenged Henningsen, stating that he knew the Junior High meeting was scheduled at a time that did not conflict with the safety meeting.  Id.  Henningsen, in

---

[1] Henningsen claims that it was common for employees to skip safety meetings if they had other work obligations.  Henningsen Decl. ¶ 12.

response, insisted that he attended a meeting at the Junior High.  Henningsen Decl. [Docket No. 26] ¶ 11.  Henningsen also claimed that after the meeting, he began prep work to set a utility pole.  Id.  Stoner did not believe Henningsen was being truthful and concluded that Henningsen skipped the safety meeting and was lying to cover up his absence.

During this conversation, Henningsen alleges that he informed Stoner about his April 19, 2013 seizure and he requested to be taken off on-call duties.[2]  Henningsen Dep. 157:15–158:3. Henningsen claims that Stoner's response to relieving Henningsen was to work "his way around the question, and didn't want to hear it."  Id. 294:23–24.  Stoner denies that Henningsen referenced his disability or requested to be taken off on-call duties during this conversation. Stoner Dep. 20:18–22.

Stoner avers he made the decision to terminate Henningsen's employment following this conversation on June 4, 2013.  Stoner Aff. ¶ 2.  Stoner claims his decision to terminate Henningsen was motivated by several incidents of misconduct.  Id. ¶¶ 2–3.  Later that day, Stoner contacted the human resources department of the League of Minnesota Cities, an organization that provides supportive services to cities throughout Minnesota, to speak with an employment attorney about terminating Henningsen.  Stoner Dep. 86:18–88:3.  Stoner also spoke with LaMaack about his decision.  Id. 86:18–22.

## G.  June 12, 2013

Although Stoner avers he made the decision to terminate Henningsen on June 4, 2013, that decision was not communicated to Henningsen until July.  In the interim, on June 12, 2013,

---

[2] On-call duty was implemented by BEL&W sometime in 2000.  It is unclear whether the part of the conversation pertaining to the safety meeting occurred before of after Henningsen's request to be taken off on-call duty.

Stoner and Henningsen met in response to a complaint by Henningsen that he was being harassed by BEL&W employees because of his epilepsy. O'Leary Sullivan Aff. Ex. 52d. During this meeting, Henningsen alleges that he told Stoner about his frequent minor seizures and he again requested to be removed from on-call responsibilities. Henningsen Dep. 158:4–14. When Henningsen attempted to provide Stoner with a letter from Dr. Britton that stated "it is medically necessary that [Henningsen] not be on call," Stoner declined to accept the letter and asked, "how [ ] are you even working here?" Stoner Dep. 24:8–10; O'Leary Sullivan Aff. Ex. 37.

## H.  July 16, 2013 Termination

The final meeting between Stoner and Henningsen occurred on July 16, 2013. At the meeting, Stoner provided Henningsen with a termination notice and a no-trespass order. Id. Exs. 43–45. The termination notice states that "[t]he basis for this termination is your most recent offensive, inappropriate and unprofessional conduct." Id. Ex. 43. The notice explicitly references the March 7, April 26, and June 4 incidents, and states:

> [t]his conduct occurred following the 2010 investigation into similar conduct where you were informed that:
>
>> You are required to treat all coworkers and subordinate employees with respect and courtesy at all times. It is expected that you will observe professional and personal boundary standards in the workplace. You are directed not to engage in angry outbursts, name calling, disrespectful language, or any other communication or behavior regarded as offensive to a reasonable person.
>
> Id.

Henningsen filed a timely charge of discrimination with the Equal Employment Opportunity Commission, which was cross-filed with the Minnesota Department of Human

Rights.  Compl. ¶ 21.  After receiving Right to Sue notices, Henningsen filed his Complaint

asserting six counts disability discrimination, retaliation, and failure to accommodate claims

under both federal and Minnesota law.  Id. ¶¶ 24–56.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall

be rendered if there exists no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.

The United States Supreme Court, in construing Federal Rule 56(c), stated in Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element
> essential to that party's case, and on which that party will bear the burden of proof
> at trial.

On a motion for summary judgment, the court views the evidence in the light most

favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

However, the nonmoving party may not "rest on mere allegations or denials, but must

demonstrate on the record the existence of specific facts which create a genuine issue for trial."

Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the

nonmoving party has been presented, summary judgment is inappropriate.  Id.  However, "the

mere existence of some alleged factual dispute between the parties is not sufficient by itself to

deny summary judgment. . . .  Instead, 'the dispute must be outcome determinative under

11

prevailing law.'" <u>Get Away Club, Inc. v. Coleman</u>, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted). Moreover, a plaintiff facing a summary judgment motion cannot "get to a jury without any significant probative evidence tending to support the complaint." <u>Rath v. Selection Research, Inc.</u>, 978 F.2d 1087, 1091 (8th Cir. 1992), (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)). In addition, "summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." <u>Krenik</u>, 47 F.3d at 959.

## B. Retaliation

The Americans With Disabilities Act ("ADA") forbids an employer from discriminating against an employee because the employee "has opposed an act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." <u>Hill v. Walker</u>, 737 F.3d 1209, 1218 (8th Cir. 2013) (quoting 42 U.S.C. § 12203(a)). The <u>McDonnell Douglas</u>[3] burden shifting framework applies. <u>Stewart v. Indep. Sch. Dist. No. 196</u>, 481 F.3d 1034, 1042–43 (8th Cir. 2007).

> Under this framework, the initial burden is on the plaintiff to establish a prima facie case, consisting of evidence: (1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show a non retaliatory reason for the adverse employment action. If the defendant can show a legitimate, non-retaliatory reason for its actions, the burden returns to the plaintiff who is then obligated to present evidence that (1) creates a question of fact as to whether [defendant's] reason was pretextual and (2) creates a reasonable inference that [defendant] acted in retaliation.

---

[3] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

Id. at 1043 (quotations and citations omitted).  Henningsen's retaliation claim under the

Minnesota Human Rights Act ("MHRA") is subject to the same standard.  Heisler v.

Metro. Council, 339 F.3d 622, 632 n.6 (8th Cir. 2003).

### 1.  Prima Facie Case

Henningsen has satisfied his initial burden.  The City concedes for summary judgment

purposes only that on June 4, 2013, Henningsen engaged in protected activity by making an

accommodation request.[4]  This is the same day Stoner decided to terminate Henningsen.  While

Henningsen and Stoner describe their June 4, 2013 conversation very differently, the record

reveals that Stoner's decision to terminate was made either immediately before or immediately

after Henningsen's request to be taken off on-call duty.  Given such a close temporal connection,

Henningsen has satisfied the low burden of demonstrating, at this juncture, a causal connection

between protected activity and adverse employment action.  See Lors v. Dean 746 F.3d 857, 866

(8th Cir. 2014) (noting that an extremely close connection between protected activity and

adverse employment action can establish causation).

### 2.  Non-Retaliatory Justification

The City has presented a sufficient non-retaliatory justification for Henningsen's

termination:  that Henningsen was fired for misconduct, which included missing a safety meeting

and being dishonest about where he was.

---

[4] The City will later contest whether Henningsen made an accommodation request or referenced epilepsy during the June 4, 2013 meeting.  On this issue, two points are worth mentioning.  First, Henningsen himself testified that his "official" request for an accommodation was made on June 12, 2013.  Henningsen Dep. 158:8.  This is consistent with Henningsen's discrimination charge that he filed with the Equal Employment Opportunity Commission, in which he cited the June 12 meeting as the time he made his accommodation request.  O'Leary Sullivan Aff. Ex. 46.

### 3. Pretext

To raise a genuine question of fact on pretext, Henningsen has the burden of presenting "evidence that (1) creates a question of fact as to whether [the City's] reason was pretextual and (2) creates a reasonable inference that [the City] acted in retaliation." Stewart, 482 F.3d at 1043 (quoting Logan v. Liberty Healthcare Corp., 416 F.3d 877, 880 (8th Cir. 2005) (quotation marks omitted)).

A genuine question of fact exists as to whether the City's stated non-retaliatory reason is pretextual. As an initial matter, the timing between the protected activity and the adverse employment action was very close; Stoner made the decision to terminate Henningsen at about the same time Henningsen requested to be taken off on-call duty. Blue Earth argues that "temporal proximity alone is generally insufficient to raise a triable issue of material fact on retaliatory motive." Flowers v. City of Minneapolis, 558 F.3d 794, 800 (8th Cir. 2009). Proximity, however, "may directly support an inference of retaliation, and it also may affect the reasonableness of inferences drawn from other evidence." Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1122 (8th Cir. 2006). The Eight Circuit has recognized that when "an employer tolerates an undesirable condition for an extended period of time, and then, shortly after the employee takes part in protected conduct, takes an adverse action in purported reliance on the long-standing undesirable condition, a reasonable jury can infer the adverse action is based on the protected conduct." Fitzgerald v. Action, Inc., 521 F.3d 867, 875 (8th Cir. 2008).

The record permits a reasonable juror to reach such a conclusion here. For years, Henningsen was accused of unprofessional workplace behavior. Eventually, these allegations were formally investigated by an independent third party, who concluded that it was more than

likely that Henningsen had engaged in the accused conduct.  Rather than terminating Henningsen at that point, the City decided upon a written reprimand.  In the follow-up investigation, Henningsen was again found to have engaged in workplace misconduct.  Again, a written reprimand was issued.  Most important, shortly after Stoner was hired as BEL&W's general manager on March 1, 2013, and almost immediately after Stoner called a meeting to address workplace conditions, Henningsen was allegedly dishonest about meeting a coworker and behaving unprofessionally towards a BEL&W customer.[5]  No documented disciplinary action was taken against Henningsen.  While Stoner avers that he talked to Henningsen about these incidents, it is undisputed that any corrective action was informal.[6]  Less than two months later, on June 4, 2013, Henningsen both engaged in protected activity and was accused by Stoner of being dishonest.  Unlike the previous incidents, however, Stoner determined that termination was warranted.  Under these circumstances, a reasonable jury could "infer the adverse action is based on the protected conduct."  Id.  The City's motion for summary judgment on Henningsen's retaliation claim is therefore denied.

## C.  Disability Discrimination

Henningsen's disability discrimination claim is closely related to his retaliation claim. The ADA protects any qualified individual with a disability from discrimination based on that disability.  42 U.S.C. § 12112(a).  The MHRA provides similar protections, prohibiting an

---

[5] Stoner testified in his deposition that Henningsen had a "pattern of behavior" of being dishonest.  Stoner Dep. 63:9–10.  Stoner admitted that these incidents went undocumented.  Id. In addition, Stoner stated that "[t]here were several incidents" of Heningsen being loud and intimidating.  Id. 60:15.  Similarly, these events went undocumented.  Id. 60:24–61:1.

[6] Henningsen denies Stoner spoke with him about his behavior at all.  Henningsen Dep. 234:15–25.

employer from making adverse employment decisions against an employee on the basis of the employee's disability.  Minn. Stat. § 363A.08, subd. 2.  Henningsen's disability discrimination claim under the MHRA is considered under the same analysis as his ADA claim.  Kobus v. Coll. of St. Scholastica, Inc., 608 F.3d 1034, 1038 (8th Cir. 2010).  Henningsen's disability discrimination claim is analyzed under the same McDonnell Douglas burden-shifting framework as was his retaliation claim.  Hutton v. Maynard, 812 F.3d 679, 684 (8th Cir. 2016).

### 1. Prima Facie Claim

A prima facie discrimination claim is comprised of three elements.  Henningsen must first show that he "(1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) suffered an adverse employment action because of [his] disability." Walz v. Ameriprise Fin., Inc., 779 F.3d 842, 845 (8th Cir. 2015).  The City argues that Henningsen has failed to present sufficient evidence establishing the last two elements.

### a. Qualified Individual

"Whether an individual is qualified within the meaning of the ADA is determined by applying a two-part test."  Walz, 779 F.3d at 845.  The first inquiry is whether Henningsen "possess the requisite skills, education, certification or experience necessary for the job." E.E.O.C. v. Wal-Mart Stores, Inc., 477 F.3d 561, 568–69 (8th Cir. 2007).  The second part asks whether Henningsen "can, despite [his] impairments, perform the essential functions of the job either with or without reasonable accommodation."  Id.

The City focuses its argument on the second part of the test, asserting that Henningsen is unqualified because his epilepsy poses a direct threat to the health and safety of others, as well as himself.  An individual who cannot safely perform the essential functions of his job because it

poses a direct threat to himself or others is not qualified.  42 U.S.C. § 12113(b); Minn. Stat. §

363A.25.  The "direct threat" defense is an affirmative defense that the employer bears the

burden of proving.  Wal-Mart Stores, Inc., 477 F.3d at 571–72.  Sustaining such a defense

requires:

> an individualized direct threat analysis that relies on the best current medical or
> other objective evidence in order to protect disabled individuals from
> discrimination based on prejudice, stereotypes, or unfounded fear.  Specific
> factors to be considered include (1) the duration of risk, (2) the nature and
> severity of the potential harm, (3) the likelihood that the potential harm will
> occur, and (4) the imminence of the potential harm.

Id. (quotation marks and citations omitted).

Absent from the record is any individualized direct threat analysis germane to this

defense.[7]  Rather, Blue Earth primarily relies on generalizations to speculate that Henningsen's

epilepsy renders him unfit for his position.[8]  Also absent from the record is any evidence

purporting to show that no reasonable accommodations exist for Henningsen to safely perform

his line superintendent duties.  See e.g., Olsen v. Capital Region Med. Cent., 713 F.3d 1149,

1154 (8th Cir. 2013) (concluding that a mammography technician was not a qualified individual

because, even with reasonable accommodations, the employee was unable to maintain the safety

---

[7] Henningsen also argues that because the City failed to plead this affirmative defense, it
has been waived.  Because Blue Earth's direct threat defense fails on other grounds, analysis of
Henningsen's waiver argument is omitted.

[8] Although Henningsen testified in his deposition that it would not be safe for him to be
driving if he experienced one of his smaller seizures, this brief testimony fails to carry Blue
Earth's burden because the City has not introduced any evidence to show that it would be an
unreasonable accommodation to pair Henningsen with another employee who did not have any
driving restriction.  Henningsen Dep. 107:24–108:1.  Significantly, Henningsen testified he
would occasionally travel as a passenger while another BEL&W employee drove, suggesting
that a reasonable accommodation existed.  Id. 126:24–127:8.

of her patients).  Because speculation is insufficient to carry Blue Earth's burden on this issue,

its direct threat defense does not preclude Henningsen's disability discrimination claim from

proceeding beyond summary judgment.

### b.  Adverse Employment Action Because of Henningsen's Disability

As was true with Henningsen's retaliation claim, "it is well-established that the threshold

of proof necessary to establish a prima facie case is minimal" and "[t]he prima facie burden is

not so onerous as, nor should it be conflated with, the ultimate issue of discriminatory action."

Young v. Warner-Jenkinson Co., Inc., 152 F.3d 1018, 1022 (8th Cir. 1998) (quotation marks

omitted).

Henningsen has satisfied this low standard of proof.  Although the question governing

Henningsen's discrimination claim is different than his retaliation claim—the question here is

the causal connection between disability and termination rather than between the protected

activity and termination—the evidence used to sustain Henningsen's prima facie retaliation case

applies equally here.

### 2.  Non-Discriminatory Justification

As before, the City's proffered reason for terminating Henningsen's employment satisfies

its burden.

### 3.  Pretext

The final shift in the McDonnell Douglas framework returns the burden to Henningsen to

adduce evidence that would permit a reasonable juror to conclude that the City's proffered non-

discriminatory justification is a pretext for unlawful discrimination.  Henningsen may carry this

burden in one of two ways.  First, Henningsen may show that Blue Earth's explanation is

"unworthy of credence . . . because it has no basis in fact."  <u>Torgerson v. City of Rochester</u>, 643

F.3d 1031, 1047 (8th Cir. 2011).  Alternatively, Henningsen may show pretext "by persuading

the court that a [prohibited] reason more likely motivated the employer."  <u>Id.</u> (modification in

original).

Like Henningsen's retaliation claim, a genuine question of fact remains as to whether the

City's proffered justification for terminating Henningsen's employment is a pretext for disability

discrimination.  As explained above, in addition to the near overlap between Henningsen's

accommodation request and his termination, the record reveals that nearly two months prior to

his accommodation request, Henningsen allegedly engaged in dishonest and unprofessional

behavior without formal consequence.  Two months later, and after making his request for an

accommodation, Henningsen is terminated for allegedly being dishonest.  Because the

accommodation request was made on account of his disability, a reasonable juror may conclude

that Henningsen's epilepsy more likely motivated the adverse employment action than his

dishonest and unprofessional behavior.

**D.  Failure to Accommodate**

Henningsen also asserts an ADA and MHRA claim for Blue Earth's purported failure to

accommodate his epilepsy.  The City argues that on-call duty is an essential function of

Henningsen's position.  According to the City, since no reasonable accommodation exists which

would allow Henningsen to perform on-call duty, Henningsen's failure to accommodate claims

fail.

Under the ADA, an employer must provide reasonable accommodations to an otherwise

qualified employee with a disability unless the accommodation would provide an undue hardship

on the employer's business.  See 42 U.S.C. § 12112(b)(5)(A).  To advance this claim to trial,

Henningsen "must establish both a prima facie case of discrimination based on his disability and

a failure to accommodate it."  Schaffhauser v. United Postal Serv., Inc., 794 F.3d 899, 905 (8th

Cir. 2015).  In addition, Henningsen must show that a reasonable accommodation is possible and

that reasonable accommodation permits Henningsen to perform the essential functions of his job.

Kallail v. Alliant Energy Corporate Servs., Inc., 691 F.3d 925, 932 (8th Cir. 2012).

Henningsen's MHRA claim is analyzed under the same standard.  Kobus, 608 F.3d at 1038.

**1.  Qualified Individual**

The City again argues that Henningsen's claim fails because he is not a qualified

individual.  Blue Earth contends that Henningsen is not qualified because he cannot perform the

essential function of being on-call with or without a reasonable accommodation.  Henningsen, in

response, argues that on-call duty is not an essential function of the line superintendent position

and, therefore, his inability to perform this role does not render him unqualified.

"An essential function 'means the fundamental job duties of the employment position the

individual with a disability holds or desires.  The term 'essential functions' does not include the

marginal functions of the position.'" Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 787 (8th

Cir. 1998) (quoting 29 C.F.R. § 1630.2(n)(1)).  Blue Earth bears the burden of showing that a

particular function is essential.  See Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1113 (8th

Cir. 1995).

Determining whether a job function is essential is fact-specific.  In considering the

employee's essential functions, evidence to consider includes:

> (1) the employer's judgment as to which functions are essential; (2) written job
> descriptions prepared before advertising or interviewing applicants for the job; (3)

the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

Kammueller v. Loomis, Fargo & Co., 383 F.3d 799, 786 (8th Cir. 2004).  "Essential functions of

the job are fundamental job duties, and the employer's judgment in this regard is considered

highly probative."  Duello v. Buchanan Cty. Bd. of Supervisors, 628 F.3d 968, 972 (8th Cir.

2010) (internal quotation marks omitted).

### a.  Factors to Consider

#### i.  Written Job Description

This factor favors Henningsen.  Prior to 2000, the City did not have on-call duty for

BEL&W employees.  This changed the following year when the City created a written job

description for the line superintendent position that expressly provided which job functions were

essential.  Henningsen Dep. 30:12–15; see also O'Leary Sullivan Aff. Ex. 9 (showing that

Henningsen reviewed the line superintendent job description on December 21, 2000).  In the line

superintendent job description, below the heading "Essential Job Functions," seven types of

work functions are listed.  On-call duty is not listed.  While the record is unclear whether on-call

duty was implemented before the line superintendent's essential job functions were

memorialized, Henningsen testified that on-call duty was added in "early 2000" and

Henningsen's handwritten acknowledgment that he reviewed the document is dated December

21, 2000.[9]  Henningsen Dep. 51:11; O'Leary Sullivan Aff. Ex. 9.

#### ii.  Blue Earth's Judgment

---

[9] LaMaack testified that he believed on-call duty was implemented sometime in 2001 or 2002.  LaMaack Dep. 30:19–21.

Blue Earth strongly argues that on-call duty is an essential function of the line superintendent's position, asserting that because BEL&W is a utility that provides continuous electric service, a qualified BEL&W employee always needs to be available to respond to any exigent circumstance involving service interruptions. The City also argues that Henningsen himself recognizes that someone needs to be on-call to respond to unanticipated issues that require immediate attention.

The City's position, however, is undercut by the 2010 event in which LaMaack directed Henningsen to obtain from his neurologist information from which the City could determine whether Henningsen's epilepsy impaired his ability to perform his job. In making this request, LaMaack explicitly directed that Henningsen's neurologist determine whether Henningsen was "able to perform all of the essential job functions of [Henningsen's] position as outlined in the enclosed job description"—the very description that does not include on-call duty as an essential function. O'Leary Sullivan Aff. Ex. 28. LeMaack's request concluded with the following:

> I specifically request that your health care provider review and consider the attached job description for your position, and that he or she review and consider the information in this letter. The letter from your health care provider must acknowledge that he or she has done so.

Id.

The City cannot have it both ways; it cannot assert on one hand that the written description is non-exhaustive while on the other hand direct an employee's health care provider to assess that employee's ability to safely perform their job by way of a job description that the City believes is incomplete. Therefore, this factor also favors Henningsen.

### iii. Amount of Time Performing On-Call Duty

Henningsen testified that on-call duty became a part of his job sometime in 2000. He

further testified that on-call responsibilities rotated between Blue Earth employees.  While the number of rotating employees changed, Henningsen stated that for a long time on-call responsibility rotated just between him and Roger Davis.  Henningsen Dep. 51:25–52:20.  Given the significant amount of time Henningsen was on-call, this factor favors the City's argument that on-call duty is an essential function of the line superintendent's position.

### iv.  Consequences of not Requiring Henningsen to Perform the On-Call Duty

The record is not well-developed on this factor and does not tip the balance toward either party.  Favoring Henningsen is that on-call duty was not established until 2000, suggesting that a different responsive protocol was in place prior to making this switch.[10]  In addition, although Henningsen's experience made him suited for being on-call, at least one other employee, Roger Davis, was also qualified to serve in this capacity.  Favoring the City, LaMaack testified, and Stoner agreed, that due to the utility's obligation to provide continuous service, someone needed to be available at all times to resolve any issues that arose.  This factor is not helpful to the analysis.

### v.  Current Work Experience of Incumbents in Similar Jobs

The record is also not well-developed on this factor and thus does not favor one side over the other.

### b.  Analysis

In weighing the five factors, the most compelling points favoring Henningsen are the

---

[10] It is reasonable to assume that the need to provide continuous electric service existed prior to requiring an employee to be on-call.  It is also reasonable to assume that some system or protocol was in place to respond to unexpected emergencies.

written work description and Blue Earth's inconsistency as to whether the work description is or is not exhaustive.  Favoring the City is that since on-call duty was implemented, Henningsen has been on-call for about half the time.  In addition, Henningsen was one of a limited number of employees who possessed the requisite experience to be on-call and the continuous nature of a utility requires someone to be available at all times.

Blue Earth has not shown as a matter of law that on-call duty is an essential function of the line superintendent position; the division of weight among the factors appears relatively balanced.  A jury can resolve this factual dispute.

### 2. Failure to Accommodate

In addition to making a prima facie case of discrimination, Henningsen must also demonstrate that the City failed to accommodate his epilepsy.  "To determine whether an accommodation for the employee is necessary, and if so, what that accommodation might be, it is necessary for the employer and the employee to engage in an 'interactive process.'"  Peyton v. Fred's Stores of Ark., Inc., 561 F.3d 900, 902 (8th Cir. 2009).  To show that the employer failed to participate in this process, Henningsen must prove:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

Id.

The first element is satisfied because if the City's position is credited, Stoner learned about Henningsen's epilepsy sometime between March and June 2013, if not earlier.  Thus, this inquiry turns on the remaining three factors.

### a. Request for Accommodation or Assistance

The City concedes for purposes of summary judgment that Henningsen made a request for an accommodation on June 4, 2013. The record also reflects that Henningsen made a second accommodation request on June 12. In defense, the City argues that since Stoner decided to terminate Henningsen on June 4, it was not under any obligation to honor Henningsen's accommodation requests. The City does not support its argument with caselaw, relying instead on an ADA factsheet created by the Equal Employment Opportunity Commission.[11] Henningsen, in his opposition memorandum, does not address the City's timeliness argument at all.

Two cases from the Eight Circuit are relevant here. The first, <u>Hill v. Kansas City Area Transportation Authority</u>, characterized as untimely an accommodation request made after the plaintiff twice committed an offense that the plaintiff knew mandated discharge. 181 F.3d 891, 894 (8th Cir. 1999). Unlike in <u>Hill</u>, however, when Henningsen made his accommodation requests, he did not know that he had committed misconduct that would result in termination. This is significant because employees may not use the ADA as an eleventh-hour antidote to stave off an impending termination. <u>See</u> <u>Green v. Medco Health Sols. of Tex., LLC</u>, 947 F. Supp. 2d 712, 729 (N.D. Tex. 2013). Because Henningsen, unlike the plaintiff in <u>Hill</u>, was without explicit knowledge that he committed terminable misconduct immediately prior to

---

[11] The U.S. Equal Employment Opportunity Commission, <u>The Americans With Disabilities Act:  Applying Performance And Conduct Standards To Employees With Disabilities</u>, https://www.eeoc.gov/facts/performance-conduct.html (last visited April 21, 2016).

requesting an accommodation, the holding in <u>Hill</u> is inapposite.[12]

In the second Eighth Circuit case, <u>Mole v. Buckhorn Rubber Products, Inc.</u>, the majority held that a request for an accommodation made on the effective date of termination was a "request for reinstatement, not a timely request for on-the-job accommodations."  165 F.3d 1212, 1218 (8th Cir. 1999).  In that case, the plaintiff was notified in writing of the date of her termination and her request for an accommodation was made on that very same day.  <u>Id.</u> at 1216.  This is not the fact pattern here.  While Stoner avers that he made the decision to terminate Henningsen on June 4, 2012, that decision was not communicated to Henningsen until July 16, 2013, over one month later.  Thus, the City's timeliness argument is not dispositive of this issue.

### b.  Good Faith Effort

It is undisputed that the City did not engage Henningsen in an interactive process to determine whether a reasonable accommodation for his epilepsy could be made.  When an interactive process does not occur, the Eighth Circuit has held this is "prima facie evidence that the employer may be acting in bad faith."  <u>Fjellestad v. Pizza Hut of Am.</u>, 188 F.3d 944, 952 (8th Cir. 1999).

### c.  Reasonable Accommodation

The final element asks whether Henningsen could have been reasonably accommodated but for the City's bad faith.  On this question, the record is not well-developed, primarily because the City did not engage in the interactive process to explore whether a reasonable accommodation was available.  Creative minds should be able to construct an accommodation

---

[12] Any suggestion that the Setter investigations put Henningsen on notice that he was subject to termination for dishonest or hostile behavior is diminished by the City's inconsistent application of discipline.

where Henningsen could be on-call without jeopardizing anyone's safety, if he were able to establish the other elements of his claim.  There is insufficient evidence to rule as a matter of law that Henningsen's disability could not have been reasonably accommodated.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 18] is **DENIED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  April 22, 2016.